**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**RENEW 81 FOR ALL,** *by its President Frank L.*
*Fowler***; CHARLES GARLAND; GARLAND**
**BROS. OF SYRACUSE, INC.; CITIZENS TO**
**PRESERVE THE CHARACTER OF**
**SKANEATELES,** *by its Executive Director*
*Holland C. Gregg***; SYRACUSE SOUTHSIDE**
**HOMEOWNERS' ASSOCIATION; CHARLES**
**PIERCE-EL; NATHAN GUNN; CHRISTOPHER**
**KOZUB; NEW YORK STATE MOTOR TRUCK**
**ASSOCIATION, INC.; TOWN OF DEWITT; and**
**TOWN OF SALINA,**

|                         |                    |
|-------------------------|--------------------|
| **Plaintiffs,**         |                    |
| **vs.**                 | **5:22-cv-1244**   |
|                         | **(MAD/TWD)**      |

**FEDERAL HIGHWAY ADMINISTRATION;**
**RICHARD J. MARQUIS,** *in his official capacity as*
*Federal Highway Administration New York Division*
*Administrator***; NEW YORK STATE DEPARTMENT**
**OF TRANSPORTATION,** *Interested or Necessary*
*Party, Not a Named Defendant***; and JOHN DOES,**
*Interested or Necessary Party, Not a Named Defendant,*

**Defendants**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|------------------|-----------------|
| **KNAUF SHAW LLP** | **ALAN J. KNAUF, ESQ.** |
| 2600 Innovation Square | **JONATHAN R. TANTILLO, ESQ.** |
| 100 South Clinton Avenue | **LINDA R. SHAW, ESQ.** |
| Rochester, New York 14604 | |
| Attorneys for Plaintiffs | |
| | |
| **U.S. DEPARTMENT OF JUSTICE** | **CHRISTOPER CHELLIS, ESQ.** |
| **ENVIRONMENTAL DEFENSE SECTION** | **ANDREW R. TARDIFF, ESQ.** |
| P.O. Box 7611 | |
| Washington, D.C. 20044 | |
| Attorneys for the Federal Highway | |
| Administration and Richard J. Marquis | |

| | |
|---|---|
| **OFFICE OF THE NEW YORK STATE** | **ANDREW G. FRANK, AAG** |
| **ATTORNEY GENERAL** | **MEREDETH G. LEE-CLARK, AAG** |
| The Capitol | **SUSAN L. TAYLOR, AAG** |
| Albany, New York 12224-0341 | |
| Attorneys for the New York State | |
| Department of Transportation and the | |
| John Does | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiffs commenced this action seeking to annul the approvals issued by Defendants Federal Highway Administration ("FHWA") and Richard J. Marquis in his official capacity as Federal Highway Administration New York Division Administrator (the "Administrator," and collectively with FHWA, "Defendants"), of the May 31, 2022 Joint Record of Decision and Findings, published on June 2, 2022, and the Final Design Report/Final Environmental Impact Statement/Final Section 4(f) Evaluation (the "FEIS"), by which Defendants have decided to proceed with the Interstate 81 Viaduct Project P.I.N. 3501.06 (the "Project"). *See* Dkt. No. 1.

Currently before the Court is Plaintiffs' motion for a preliminary injunction, which Defendants and the New York State Department of Transportation (as an interested or necessary party) oppose. *See* Dkt. Nos. 28, 32-34. For the reasons set forth below, Plaintiffs' motion is denied.

### II. BACKGROUND

**A.     Statutory Framework**

Plaintiffs seek an injunction based on purported violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by the FHWA. NEPA requires that federal agencies conduct environmental reviews of proposed agency actions. In particular, before

2

undertaking a major federal action, such as approving funding for a project, that would

"significantly affect[ ] the quality of the human environment," an agency must prepare an

environmental impact statement.  *See* 42 U.S.C. § 4332(C).  The environmental impact statement

must describe, among other things, the reasonably foreseeable environmental effects of the

proposed action, any unavoidable adverse environmental effects, and alternatives to the proposed

action.  *See id.*

New York agencies have similar, but not identical, environmental review obligations

under the State Environmental Quality Review Act ("SEQRA").  *See* N.Y. Envtl. Conserv. Law

§§ 8-0101 – 8-0117.  Before undertaking or approving action that "may have a significant effect

on the environment," the agency must prepare or cause to be prepared an environmental impact

statement that describes, among other things, the environmental impact of the proposed action,

any unavoidable adverse environmental effects, and alternatives to the proposed action.  *See id.* §

8-109(2)(b)-(d).  If a proposed project requires approval by both federal and state agencies,

SEQRA review and NEPA review are coordinated "in a single environmental reporting

procedure." *Id.* § 8-0111(1).

## B.    The I-81 Viaduct Project

Interstate 81 ("I-81") runs through downtown Syracuse on an aging viaduct whose

construction in the 1960s, before enactment of modern environmental laws, led to the

fragmentation of Syracuse's Southside neighborhood.  Dkt. No. 28-5 at 2.  The viaduct does not

comply with modern design standards and is increasingly unable to adequately accommodate daily

traffic that flows through the City, leaving the viaduct prone to congestion and high accident rates.

*See id.* at 3-4.

In 2008, the FHWA and the New York State Department of Transportation (the "Department") recognized that the viaduct was nearing the end of its useful life and began planning for its repair or replacement. Over the next five years, the agencies conducted a study that examined the section of the highway that runs through Syracuse and identified strategies to better meet local needs. In 2013, the FHWA published a notice of intent to prepare an environmental impact statement. *See* 78 Fed. Reg. 52, 819 (Aug. 26, 2013). Throughout the ensuing environmental review, the Department and FHWA served as joint lead agencies for purposes of their NEPA and SEQRA obligations. *See* Dkt. No. 28-5 at 2.

**C.     The Environmental Review**

Over the next nine years, the Department and the FHWA conducted an extensive environmental review. During the initial scoping phase, the agencies considered a wide range of alternatives, including the repair and continued maintenance of the existing viaduct, the replacement of the current viaduct with a new viaduct that would meet modern design standards, and the removal of the viaduct and re-routing of I-81 through a tunnel, via a depressed highway, or on surface-level streets. To determine which alternatives warranted further analysis, the agencies applied a variety of screening criteria, including consistency with the purposes and objectives of the Project, the amount of property that would need to be acquired, constructability, and estimated cost.

Ultimately, the agencies selected three alternatives for full evaluation: (1) the "no-build alternative," which would include repair and maintenance of the existing viaduct; (2) the "viaduct alternative," which would replace the existing viaduct with a new, larger viaduct at a higher elevation to meet modern design standards; and (3) the "community-grid alternative," which would demolish the viaduct, re-route local traffic to a street-level highway, and re-route some

4

through-traffic to the existing Interstate 481 ("I-481"), a part of which would be improved and redesignated as I-81.

The agencies prepared a joint draft environmental impact statement that compared the impacts of the three selected alternatives.  That draft statement identified the community-grid alternative as the preferred alternative, based on the project purpose, needs, and objectives; the comparative social, economic, and environmental effects of the alternatives; and the relevant environmental protection goals.

**D.      The Final Environmental Impact Statement and the Record of Decision**

In April 2022, the Department and FHWA released a final environmental impact statement ("FEIS") that adhered to their conclusion that the community-grid alternative was the best option. This decision was made after analyzing the impacts of all three alternatives and considering public comments.

Regarding potential air-quality impacts of the three alternatives, the agencies examined such impacts from a variety of pollutants.  The agencies examined these potential impacts throughout the project area, including along the existing I-81 corridor and along the I-481 corridor.  For this purpose, the agencies created traffic models that studied traffic flow for each alternative, identifying likely future "hot spots" of pollutants.  Ultimately, the agencies concluded that the community-grid alternative would have no significant adverse air-quality impacts.  In fact, they concluded that the community-grid alternative would actually improve long-term air quality in the area of the existing viaduct, while reducing emissions in the study area overall.

Regarding the potential water-quality impacts of the three alternatives, the agencies considered the potential impacts on surface waters, including Onondaga Creek and Lake. Stormwater from and around the viaduct currently flows into the existing combined sanitary and

storm sewer system, which overflows in certain wet-weather events when its capacity is exceeded and thus discharges polluted water directly into Onondaga Creek and thereby Onondaga Lake. Analyzing the three alternatives, the agencies concluded that the community-grid alternative would best address this problem, as it would permanently improve the water quality of the Lake. The environmental impact statement explains that the community-grid alternative includes plans to protect waterbodies from roadway runoff by diverting much of it to vegetative buffers and other infrastructure features that promote ground infiltration as well as other treatment methods, rather than allowing direct discharge of polluted water from the highway through the combined system.

The agencies also considered other potential environmental impacts of the three alternatives, including potential impacts on, among other things, climate change, wildlife (including threatened and endangered species), historic and cultural resources, traffic patterns (including the frequency of crashes on the current and future I-81 and the availability of parking), neighborhood character, and the impact on minority and low-income communities (also known as environmental justice communities). All of these potential impacts and others were evaluated not only for the areas directly adjacent to the current I-81 viaduct, but also for areas around the sections of I-481 and I-690 that would be affected by alteration to the current I-81 viaduct.

In June 2022, the Department and FHWA published the Record of Decision, which selected the community-grid alternative. The Record of Decision served as the final NEPA document and satisfied the Department's SEQRA obligations. *See* 23 C.F.R. § 771.127; 17 N.Y.C.R.R. §§ 15.9(b), 15.6(c)(1).

### E.   The Micron Project

Four months after the publication of the Record of Decision, in October 2022, Governor Hochul and other elected officials announced plans for Micron Technology to build a microchip

facility in Clay, New York, ten miles north of downtown Syracuse.  While touting the immense economic benefits the facility would bring to the region, the Governor's press release made clear that the project would take "20-plus years" and involve "multiple phases." *See* Governor's Press Office, Press Release, *Hochul, Schumer, McMahon Announce: Micron is Coming to Onondaga County!*, available at https://www.governor.ny.gov/news/hochul-schumer-mcmahon-announce-micron-coming-onondaga-county-micron-will-invest-unprecedented.

Following the announcement of the Micron facility, petitioners asked the Department and FHWA to supplement the environmental review to account for the facility's possible impacts on traffic.  *See* Dkt. No. 1-8.  The FHWA declined to provide a substantive answer, and the Department has made no decision.  *See* Dkt. No. 1-9.

## F.    The State Court Litigation

On September 30, 2022, a group of entities and individuals largely overlapping with the Defendants in this case filed an Article 78 proceeding in Onondaga County Supreme Court against the Department.  *See Renew 81 for All v. N.Y.S. Dept. of Transp.*, No. 007925/2022 (Sup. Ct. Onondaga Cty.).  The petition alleged five causes of action, including a claim that the Department's environmental review, including the joint Record of Decision and the joint environmental impact statement, was "illegal, arbitrary and capricious."  The specific factual allegations of the Article 78 petition concerned issues relating to greenhouse gas emissions, air quality, traffic, cumulative impacts, and project alternatives.  The state court petitioners later filed a supplemental petition setting out a sixth claim alleging that it was "illegal, arbitrary and capricious" for the Department not to have decided to prepare a supplemental environmental impact statement to address potential traffic impacts due to the Micron project.  The FHWA was

named as a party to the state court action, but the court dismissed it on sovereign immunity grounds.

In early November 2022, the state court petitioners filed a motion for a preliminary injunction.  In February 2023, the Onondaga County Supreme Court issued a permanent injunction that banned the demolition of the I-81 viaduct pending some additional environmental review, but allowed construction to proceed on enhancements to existing I-481 and other parts of the overall I-81 project.  In its order, the state court found in the state court petitioner's favor on three merits issues under SEQRA relating to air pollution, stormwater, and supplementation to address the Micron project.  On the remaining merits issues, the state court decision ruled in the Department's favor.

On February 2, 2024, the Fourth Department reversed the Onondaga County Supreme Court's decision on the three rulings in the state court petitioner's favor.  In its order, the Fourth Department held that "respondents complied with their substantive obligations under SEQRA inasmuch as they took the requisite "hard look" at the relevant environmental factors, including air quality and stormwater management, and "made a 'reasoned elaboration' of the basis for [their] determination." Dkt. No. 39 at 5-6.  As to the issue of supplementation of the environmental review to address the Micron project, the Appellate Division ruled that the state court petitioners failed to establish a clear legal right to such supplementation in the absence of a nondiscretionary duty to perform such supplementation.  *See id.* at 5.  The Fourth Department further held that, even if the absence of such supplementation constituted the Department's constructive denial of the state court petitioners' request to perform such supplementation, that denial was not arbitrary or capricious given the absence of evidence in the record of information sufficient to perform such

supplementation. *See id.* Accordingly, the Fourth Department modified the judgment by dismissing the petition in its entirety, thereby dissolving the state court injunction. *See id.* at 6.

**G.      This Litigation**

On November 22, 2022, Plaintiffs commenced this action setting out two causes of action. *See* Dkt. No. 1. Using language parallel to the first cause of action in the state petition, the first cause of action in the federal complaint alleges that the FHWA's environmental review, including the joint Record of Decision and the joint environmental impact statement, was "illegal, arbitrary and capricious." *Id.* at ¶ 314. Like the state petition, the factual allegations in the federal complaint concerned issues relating to greenhouse gas emissions, air quality, traffic, cumulative impacts, and project alternatives. *See id.* at ¶¶ 5, 7-9, 11, 73, 129-73, 205-21, 253, 272-73, 302, 304-05. Plaintiffs' NEPA claim also included allegations that it was unlawful for the FHWA not to have decided to prepare a supplemental environmental impact statement to address potential changes due to the Micron project. *See id.* at ¶¶ 309-10.

Although Plaintiffs raised multiple causes of action in their complaint, for purposes of their motion for injunctive relief, Plaintiffs rely solely on their claims brought pursuant to NEPA. *See* Dkt. No. 28-1 at 12-24. Specifically, Plaintiffs claim that the NEPA review was deficient in multiple respects, including the following: (1) "the underlying analysis in the EIS failed to properly analyze multiple impacts, as held by Supreme Court, Onondaga County;" (2) "Defendants failed to consider cumulative impacts;" (3) "Defendants failed to properly analyze alternatives;" and (4) "Defendants failed to prepare a Supplemental Environmental Impact Statements ('SEIS') related to the newly announced plan by Micron Technology ('Micron') to construct a semiconductor plant ... in the Town of Clay near I-81 north of the City of Syracuse." *Id.* at 13.

### III. DISCUSSION

**A.      Standard of Review**

"Issuance of a preliminary injunction is an 'extraordinary and drastic remedy' that is 'never awarded as of right.'" *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)) (other citation omitted).  "Preliminary injunctive relief 'should not be routinely granted.'" *Id.* (quotation omitted).  "When deciding whether to issue a preliminary injunction, courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or ... sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotation omitted).  While in the Second Circuit the first prong can be sometimes satisfied if there is merely "a serious question going to the merits," given the preliminary injunction "'will affect government action taken in the public interest pursuant to a statutory or regulatory scheme,' it 'should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (quotation omitted).  Additionally, where, as here, "the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**B.     Legal Framework**

*1. NEPA*

NEPA requires federal agencies to consider the impacts of, and alternatives to, federal

actions significantly affecting the environment.  *See* 42 U.S.C. §§ 4321, 4331.  NEPA ensures that

federal agencies take a "hard look" at the environmental consequences of their proposed actions

before deciding to proceed and provides "for broad dissemination of relevant environmental

information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  While

NEPA establishes procedures by which agencies must consider the environmental impacts of their

actions, it does not dictate substantive results.  *See id.* (citations omitted).  "If the adverse

environmental effects of the proposed action are adequately identified and evaluated, the agency is

not constrained by NEPA from deciding that other values outweigh the environmental costs."

*Id.* (citations omitted).

*2. Review of Agency Action Under the Administrative Procedure Act*

Judicial review of agency decisions under NEPA is provided by the Administrative

Procedure Act ("APA"), *see Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d

Cir. 1985), which maintains that an agency action may be overturned only when it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).  Though a court's review under the APA "must be searching an careful," it is not *de

novo.  See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted).  Instead,

the court is to determine "whether the decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc.

v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

99 (1977).  "In reviewing agency action, this Court may not 'substitute its judgment for that of the agency.'" *Nat. Res. Def. Council v. U.S. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (citation omitted).

**C.     Application**

### *1. Irreparable Harm*

Plaintiffs first contend that "procedural injury suffered by Plaintiffs as a result of Defendants' failure to comply with NEPA constitutes irreparable harm in itself." Dkt. No. 28-1 at 10 (citing *I-291 Why? Association v. Burns*, 372 F. Supp. 223, 263 (D. Conn. 1974); *Envir. Defense Fund, Inc. v. Froehlke*, 477 F.2d 1033, 1037 (8th Cir. 1973)).  Plaintiffs further contend that "Defendants failed to comply with their obligations under NEPA resulting in procedural injury." *Id.*  However, as the FHWA correctly notes, "failure to comply with NEPA" does not "constitute[ ] irreparable harm in itself." Dkt. No. 34 at 13.  As the Supreme Court has clarified, assuming an injunction is the appropriate remedy in a NEPA case "invert[s] the proper mode of analysis." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (citation omitted). "No such thumb on the scales is warranted" and, in a NEPA case, "a court must determine that an injunction *should*" – rather than should not – "issue under the traditional four-factor test." *Id.* at 157-58 (emphasis in original).  Likelihood of success on the merits – that is, likelihood of establishing a NEPA violation – is only one of the four factors and is a factor separate from irreparable harm.

Plaintiffs also rely on the Project's potential impacts to various species, citing cases that aesthetic injuries to species can be valid imminent harms.  *See* Dkt. No. 28-1 at 10-11 (citing *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 449 (S.D.N.Y. 2010); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219-20 (D.D.C. 2003).  But unlike the plaintiffs in those cases, Plaintiffs here do not allege that they would be harmed if the Project caused impact to those

species. *Compare* Dkt. No. 1 at ¶ 270 (describing the Project's expected impacts on species), *with Habitat for Horses*, 745 F. Supp. 2d at 448 ("The Moores assert irreparable harm based on impending aesthetic injury. They travel regularly to North Piceance to experience the wild horses"); *Fund for Animals*, 281 F. Supp. 2d at 219-20 ("[P]laintiffs maintain that it is incontrovertible that their ability to view, interact with, study, and appreciate mute swans will be affected by defendants' actions, and therefore irreparable harm to their aesthetic interests will ensue"). As the Second Circuit has explained, "[t]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation and emphasis omitted). Plaintiffs fail to make any attempt to do so here, including through an affidavit. Nor could they, because Plaintiffs' complaint makes clear that they are advocating for other project alternatives, *see, e.g.*, Dkt. No. 1 at ¶ 8 ("Defendants ... irrationally rejected the 'Viaduct Alternative'"), which the Record of Decision makes clear would also have impacts on various indigenous species, such as the Indiana bat and the northern long-eared bat. *See* Dkt. No. 34 at 15. Moreover, the page of the Record of Decision that Plaintiffs themselves cite, states that the I-81 project overall is "not ... likely to adversely affect" those bats, contradicting the assertion of harm. *See* Dkt. No. 28-5 at 18.

Likewise, Plaintiffs argue that non-injunctive relief cannot adequately compensate for the "removal of multiple infrastructure assets used by Plaintiffs." Dkt. No. 28-1 at 9. However, they do not support their assertion with any evidence, such as an affidavit. Additionally, the removal of the existing infrastructure could only constitute harm if they were advocating for the No Build Alternative. But as Plaintiffs' complaint makes clear, Plaintiffs simply prefer alternatives other

than the Community Grid, which would also entail removal of the I-81 Viaduct.  *See* Dkt. No. 34 at 16.

Plaintiffs also argue that an injunction is necessary to stop "utilization of taxpayer funds." Dkt. No. 28-1 at 9.  But they cite no case where such an injury was the basis for a preliminary injunction and provide no evidence that the expenditures as such will affect them, for example, by increasing their tax obligations.  *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 343 (2006) (holding that taxpayers lacked standing to object to expenditures "simply because they are taxpayers").

Plaintiffs also argue, through their attorney, that the Project is likely to have an impact on "air quality." Dkt. No. 28-2 at ¶ 11.  As a preliminary matter, a declaration from an attorney is not probative support for irreparable harm.  *See Marks v. Lainoff*, 466 F. Supp. 301, 304 (S.D.N.Y. 1979) (denying the plaintiff's motion for a preliminary injunction because there was "no evidence" of irreparable harm "other than conclusory statements in plaintiff's attorney's affidavit"); *see also Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) (holding that an attorney's affidavit, which does not cite to specific facts and does not demonstrate how the attorney has first-hand knowledge "is not entitled to any weight").  Based on a hearsay article, the attorney declaration purports to establish harm from temporary traffic delays due to the allowed work at one interchange.  *See* Dkt. No. 28-2 at ¶ 21.  However, Plaintiffs cite no authority that indicates that such minor delays, if any, constitute irreparable harm, *see id.* at ¶¶ 21, 23-27, and there is case law to the contrary.  *See West Alabama Quality of Life Coalition v. U.S. Fed. Hwy. Admin.*, 302 F. Supp. 2d 672, 674-75, 684 (S.D. Tex. 2004) (holding that, in a NEPA challenge relating to highway reconstruction, temporary effects of construction on traffic were not permanent or long-duration injuries constituting irreparable harm).

The attorney declaration also refers to purported irreparable harm to "buildings and neighborhoods." Dkt. No. 28-2 at ¶ 11.  Again, however, neither that declaration nor anything else identifies a building or neighborhood that the work will irreparably affect.  *See Tahoe Cabin, LLC v. Fed. Hwy. Admin.*, No. 3:22-cv-175, 2022 WL 19296773, *3 (D. Nev. Oct. 4, 2022) (denying injunction in NEPA challenge to highway project and noting that "[s]imply stating that something may occur in the future does nothing to show the Court that irreparable harm is likely").

In short, the Court finds that Plaintiffs have failed to establish "an injury that is neither remote nor speculative, but actual and imminent[.]" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (quotations and citation omitted).  Accordingly, Plaintiffs' motion for a preliminary injunction is denied on this ground.  Even assuming that Plaintiffs had demonstrated irreparable harm, which they have not, they have failed to demonstrate a likelihood of success on the merits, which is discussed in detail below.

### 2. Likelihood of Success on the Merits

In their motion, Plaintiffs contend that the FHWA's traffic analysis was not based on reliable data, that the FHWA's greenhouse gas and air quality analysis was unreasonable and inconsistent, and that the FHWA failed to thoroughly consider the economic effects of the Project. *See* Dkt. No. 28-1 at 12-19.  Further, Plaintiffs claim that the FHWA's failure to prepare a supplemental environmental impact statement violated NEPA because the Micron project constituted "'significant new circumstances or information relevant to environmental concerns.'" *Id.* at 19 (quoting 40 C.F.R. § 1502.9).  The Court addresses each of these contentions separately below.

#### a. Traffic Analysis

Plaintiffs allege that the FHWA's traffic analysis was based on "[f]aulty [d]ata and [l]ogic." Dkt. No. 28-1 at 17.  The Court disagrees.  In November 2013, the FHWA collected actual traffic data along various highway segments and at more than 290 intersections in the Project area.  This data indicates that, of the total traffic volume on I-81 through Downtown Syracuse, only around 12 percent had origins and destinations beyond the limits of the two I-81 interchanges with I-481.  Most traffic "is destined for Downtown and University Hill, the two major regional employment centers."  *See* Administrative Record ("AR") at 483.  During the morning peak hour, commuters travel from the outer suburbs towards Downtown Syracuse, and the pattern reverses in the evening peak hour.  *See id.* at 330.

Subsequently, the FHWA prepared I-81 Viaduct traffic simulation models using VISSIM simulation software, "a microscopic, time-step and behavior-based model which analyzes multi-modal traffic flows with the flexibility of modeling all types of geometrics and traffic control schemes." AR at 4315.  The VISSIM model's geographic scope was "developed specifically" to allow for an "area-wide assessment" of traffic.  *See id.* at 4316.  The model area "was purposely defined as the area where a major shift in local traffic using alternate routes *could occur* as a result of the reconstruction or removal of the I-81 viaduct." *Id.* (emphasis added).  As such, the model area includes the I-81, I-690, I-481, and I-90 interstate system, as well as surface streets that could be affected by the Project, including Downtown Syracuse and University Hill.  *See id.*  Roadways excluded from the model are roadways where a significant shift in traffic is not expected to occur, and that includes traffic from south of current I-481.

Plaintiffs allege that the EIS's traffic analysis is deficient because it fails to consider vehicles avoiding Syracuse altogether by diverting through towns south and west of the Project area.  *See* Dkt. No. 28-1 at 17.  As discussed above, however, the Final EIS does consider this

possibility; it simply concludes that significant diversions will not occur.  It is not the Court's role to second-guess this conclusion.  *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1544 (11th Cir. 1990) (deferring to the FHWA's traffic modeling and noting that a district court should not serve as a "super professional transportation analyst") (citation omitted); *see also Druid Hills Civic Ass'n, Inc. v. FHWA*, 772 F.2d 700, 711 (11th Cir. 1985).  For instance, under the Community Grid, "a comparison of traffic exiting I-81 at New York State Route 20 [(an exit south of Syracuse that goes west to Skaneateles)] with the Community Grid Alternative versus the No Build Alternative indicated a negligible number of traffic diversions along this route." AR at 32212.[1]

Plaintiffs further allege that the EIS improperly relied on 2013 base-year traffic data and growth rates that are too low.  *See* Dkt. No. 28-1 at 18.  However, the FHWA ensured its 2013 base-year data remained reliable by conducting a traffic data revalidation study.  *See* AR at 4779-81.  The study compared the expected 2019 traffic with actual 2019 traffic data.  *See id.*  The FHWA retained the 2013 base year because the study confirmed that "the study area has not experienced significant travel pattern changes in recent years." *Id.* at 329.  Plaintiffs similarly assert that "[t]he EIS relied on old job statistics from 2009" and therefore the EIS is "woefully out of date" due to "large regional growth" since then.  *See* Dkt. No. 28-1 at 18.  However, the EIS relies on nearly two decades of economic data which shows that Syracuse's labor force decreased by 3.6 percent between 2000 and 2019.  *See* AR at 737.  In that same period, Onondaga County's

---

[1] During construction, the Final EIS anticipates that truck volume may increase along certain roads south and west of Syracuse.  *See* AR at 506.  For instance, along U.S. Route 20, the truck volume increase is projected to be approximately 20 trucks in the peak direction during peak hours.  *See id.*

labor force increased by 2.9 percent, and the five-county region's labor force increased by just 1.1 percent. *See id.*

Finally, Plaintiffs allege that traffic analyses failed to account for "excess traffic events." Dkt. No. 28-1 at 18. However, the EIS does account for "peak hour" travel, which the EIS found occurred in the morning and evening rush hours. *See* AR at 474-86.

Accordingly, the Court finds that Plaintiffs are unlikely to succeed on the merits of this claim because the FHWA took the requisite "hard look" at the relevant issues and Plaintiffs are unlikely to establish that the traffic analysis was arbitrary or capricious.

### b. Greenhouse Gas Emissions

Plaintiffs next allege that the EIS "illogically predicted" that greenhouse gas emissions from the Community Grid would be less than the other alternatives because vehicles traveling at slower speeds through multiple stoplights will have higher emissions. *See* Dkt. No. 28-1 at 14. As the FHWA notes, however, the Final EIS does not rely on a static analysis. Instead, the Final EIS predicts that the Community Grid "would shift some vehicles to different roadway types resulting in vehicle speed changes. *See* AR at 954. For example, on existing I-481 and I-690, "[t]raffic volumes will increase." *Id.* Given that vehicle efficiency depends not only on miles traveled but also the travel speed, the FHWA determined that "[f]or all analysis years ... the improvements in travel speed as well as the predicted shift in traffic between roadway and the associated traffic conditions would result in decreases in annual emissions for all pollutants analyzed." *Id.* at 935. In the end, "[t]he net effect would be GHG [greenhouse gas] emission reductions." *Id.* at 954.

Against that, Plaintiffs contend that the EIS is fatally flawed because the Final EIS did not account for "traffic diverting to the west from I-81 south of I-481." Dkt. No. 28-1 at 15. However,

as discussed above, the traffic model includes all areas where major traffic shifts "could occur as a result of the reconstruction or removal of the I-81 viaduct." AR at 4316.  Plaintiffs, therefore, fail to demonstrate a likelihood of establishing that the FHWA's greenhouse gas analysis was arbitrary or capricious.

### c. Air Quality Analysis

Plaintiffs next contend that FHWA's air quality analysis had "glaring omissions." Dkt. No. 28-1 at 17.  Plaintiffs rely on language from the Onondaga County Supreme Court's decision, in which the court "pointed out contradictory assertions regarding the diversion of traffic as it related to air quality." *Id.*  Specifically, Plaintiffs note that "[t]he ROD claimed that the Community Grid Alternative 'would not generate or divert substantial volumes of diesel vehicle traffic[,]' while also claiming that 'traffic would increase substantially on former I-481 both north and south of I-690 and decrease on former I-81.'" *Id.*  "As the Supreme Court, Onondaga County found, '[t]hese two statements cannot logically coexist.'" *Id.*  Plaintiffs also note that the state court found that "'[d]espite the [State's] admission that traffic would increase substantially on the present I-481, scant evidence of reviewing the I-481 corridor appears in the EIS and specifically the air quality review sections." *Id.* (citing Dkt. No. 28-3 at 19).

First, the Court notes that the Fourth Department disagreed with the Onondaga County Supreme Court's analysis and found that the Department "complied with their substantive obligations under SEQRA inasmuch as they took the requisite 'hard look' at the relevant environmental factors, including air quality and stormwater management, and 'made a reasoned elaboration' of the basis for [their] determination." Dkt. No. 39 at 5-6.  This Court agrees with the Fourth Department.

The FHWA conducted a thorough mesoscale (regional) analysis for carbon monoxide (CO), volatile organic compounds (VOCs), oxides of nitrogen (Nox), particulate matter (PM) less than or equal to 2.5 micrometers (PM2.5) and PM less than or equal to 10 micrometers (PM10). *See* AR at 17795, 17802. The analysis included impacts along current I-81 and all roadways "where a shift in local traffic using alternate routes could occur" because of the Project, which "includes I-81, I-690, I-481, and I-90 interstate systems." *Id.* at 17802.

Plaintiffs assert that "only two sites [were] chosen to conduct air quality testing," and that this is inadequate. *See* Dkt. No. 28-1 at 17. Plaintiffs appear to be referring specifically to the microscale (local) analysis, which was one small part of FHWA's comprehensive air quality analysis. Microscale analysis can be conducted for both CO and PM. In deciding whether to conduct CO microscale analysis, FHWA first conducted a volume threshold screening. *See* AR at 932. Based on the results of that screening, it concluded that CO microscale analysis was not warranted. *See id.* As for PM microscale analysis, the FHWA reasonably relied on guidance from the Environmental Protection Agency ("EPA") in determining that PM microscale analysis was not warranted. *See id.* (citing USEPA, *Transportation Conformity Guidance for Quantitative Hot-Spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas*, EP-420-B-15-084, Nov. 2015); *see also Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 694 (D. Md. 2007) (discussing the then-current 2006 guidance and noting that the EPA "directed federal agencies to follow this guidance").

Regardless, the FHWA chose to conduct PM microscale testing "to address concerns expressed by the public" pertaining to PM air quality in the I-81 area. *See* AR at 932-33. This testing was conducted at four – not two – intersections, which were selected due to projected traffic conditions, roadway modifications, and proximity to sensitive receptors. *See id.* at 933,

20

17802.  Overall, as the FHWA contends, the record shows a thorough, area-wide air quality analysis, bolstered by voluntary microscale testing at several locations of particular interest to the community.  *See id.* at 919-39; *see also Senville v. Peters*, 327 F. Supp. 2d 335, 358 (D. Vt. 2004) (affirming the FHWA's decision to only partially update its air quality modeling because "the Court's task ... is not to dictate the sort of hard look the agency must take, but to determine whether it was hard enough").

Finally, Plaintiffs assert that the EIS is inconsistent because it concludes that the Community Grid "would not generate or divert substantial volumes of diesel vehicle traffic" as compared to the No Build Alternative, while also providing that "traffic would increase substantially on former I-481." Dkt. No. 28-1 at 17 (citation and emphasis omitted).  However, as the Final EIS clarified, "[t]he Project [as a whole] would not generate or divert a substantial volume of diesel vehicle traffic as compared with the No Build Alternative." AR at 919; *see also id.* at 923 ("The Viaduct Alternative would not generate or divert a substantial volume of diesel vehicle traffic as compared with the No Build Alternative").  In other words, the Final EIS is referring to diversion outside the Project area, rather than diversion to different routes through the Project area.  But this is not to say that drivers of diesel vehicles will not select a different route through the project area to get to their destination.  Indeed, the Community Grid plan is premised on traffic being dispersed differently.  The Final EIS is explicit that, under the Community Grid, "former I-481 [becomes] the quickest path for regional north-south travel through the project area" causing traffic on that road to "increase substantially." *Id.* at 482.

Additionally, as the Department notes, the record determined that most diesel-powered traffic on the viaduct is essentially local traffic bound for Downtown Syracuse locations and thus would not switch to I-481.  *See* AR at 212973, 323975-76.  On the other hand, the Department

anticipates that replacement of the viaduct with the Community Grid Alternative will divert a substantial portion of through traffic now on the viaduct to I-481. *See id.* at 212973, 212947. As such, there is no inconsistency on this issue.

Again, as the Fourth Department determined, the Court finds that the FHWA took the requisite "hard look" at the impact of the Project on air quality and that Plaintiffs are unlikely to establish that the FHWA's air quality analysis was arbitrary or capricious.

### d. Economic Effects

In an entirely conclusory manner, Plaintiffs claim that the EIS failed to assess the impacts of future development that could be induced by the Community Grid. *See* Dkt. No. 28-1 at 19. However, in Section 6-3-2 of the Final EIS, the FHWA considered the "potential beneficial and adverse effects of the project alternatives on the local and regional economies" as they relate to environmental concerns. *See* AR at 734. As the FHWA notes, NEPA does not require consideration of "speculative and contingent" impacts. *See Vill. of Grand View v. Skinner*, 947 F.2d 651, 659 (2d Cir. 1991) (holding that the FHWA's analysis of an improved highway interchange in Rockland County did not need to consider whether possible future developments in the Tappan Zee Corridor would ultimately require another span of the Tappan Zee Bridge). Plaintiffs do not identify any specific projects that the Community Grid may induce and the EIS consequently failed to analyze; and, therefore, Plaintiffs failed to demonstrate a likelihood of establishing that the FHWA's economic effects analysis was arbitrary or capricious.

### e. The Micron Project

Plaintiff next alleges that "it was arbitrary and capricious for Defendants to fail to decide to prepare [a supplemental EIS] due to the change in circumstances presented by the Micron Project, in light of the huge impact on traffic patters and volumes that will result from the

projected 50,000 new employees (22% of the current Onondaga County workforce), and a population grown of perhaps 125,000 (27% of the current County population) or more." Dkt. No. 28-1 at 20.  However, agencies do not need to "supplement an EIS every time new information comes to light after the EIS is finalized[.]" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1058 (D.C. Cir. 2017).  Rather, the FHWA regulations require that the agency supplement an EIS whenever it determines that "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts *not evaluated in the EIS*." 23 C.F.R. § 771.130 (emphasis added).  An agency's determination of whether a supplement EIS is required under particular circumstances is governed by a "rule of reason," which "turns on the value of the new information to the still pending decisionmaking process." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989).

The Court agrees with the FHWA that, at this time, the proposed Micron plant north of Syracuse would not result in significant environmental impact not already evaluated in the EIS. The EIS already accounts for long-term growth of the Syracuse area and increased demand for transportation in and through the Project area.  *Compare, e.g.*, AR at 475 (setting forth table of expected travel times, delay, and speeds for 2026), *with id.* at 476 (setting forth table of expected travel times, delay, and speeds for 2056).  Moreover, the EIS specifically notes the "[p]lanned" development of "White Pine Commerce Park," which is now the planned future site of the Micron project, that may result in 2.5 million square feet of light manufacturing/electronics.  *See id.* at 598.

Moreover, as the Department notes, it would be premature to supplement the EIS now to account for the proposed Micron facility.  The proposal to construct that plant was announced four

months after the environmental review was completed.  There are no publicly available details

about the Micron campus, aside from information in the press.  *See* Dkt. No. 32 at 27.  As the

Department notes, at this time there is inadequate information for either the FHWA or the

Department to conduct a meaningful assessment of the impacts from the Micron facility.  "To do

so either agency would need to know where the buildings, parking lots and employees will be

located, when the stages of construction are anticipated to occur, how many employees will likely

work at the facility and their likely times of commute, all of which are critical to a meaningful

assessment of the facility's potential impacts on traffic patterns." *Id.* at 28.  Indeed, the Fourth

Department agreed with the Department, holding that "to the extent that respondents' failure to

respond to petitioners' request to conduct a [supplemental EIS] constituted a constructive denial

thereof, we conclude that the discretionary denial was not arbitrary and capricious in light of the

absence of evidence in the record that sufficient concrete information on the anticipated

semiconductor manufacturing campus project existed to permit effective review at that time." Dkt.

No. 39 at 6.

As such, the Court finds that Plaintiffs have not established that they are likely to succeed

on their claim that FHWA's failure to prepare a supplemental EIS was arbitrary or capricious.

### f. Consideration of Alternatives

Plaintiffs next contend that "a major substantive deficiency in the NEPA Review of the

Project was the failure of Defendants to fully analyze a reasonable range of alternatives in order to

avoid or minimize adverse environmental impacts.  Only the 'No Build Alternative,' and two

actual Project Alternatives – a new Viaduct Alternative, and the selected Community Grid

Alternative, were fully analyzed and presented in the DEIS for public comment." Dkt. No. 28-1 at

22.  Plaintiffs note that other alternatives "were briefly discussed in the EIS but summarily

dismissed with little or no meaningful analysis, such as a depressed highway or tunnel." *Id.* at 23.

Plaintiffs claim that some alternatives, "such as the Viaduct Alternative, were burdened with

unnecessary features and physical configurations which were not placed on the Community Grid

alternative that arbitrarily and needlessly made them less desirable." *Id.*  Additionally, Plaintiffs

argue that some "[a]lternatives were irrationally rejected out-of-hand by 'fatal flaw' screening if

they were inconsistent with any one of certain predetermined objectives ... or Project Needs that

appear designed specifically to result in recommending the Community Grid Alternative." *Id.*

According to the administrative record, including the No Build Alternative, the FHWA

considered a total of twenty different alternatives during its scoping process.  *See* AR at 158.  Five

of these were viaduct alternatives, two were community grid alternatives, eight were tunnel

alternatives, two were depressed highway alternatives, and two were classified as "[o]ther"

alternatives.  *See id.*  Plaintiffs allege that the dismissal of the V-5 New Stacked Viaduct Concept

was improper, that the "Bridge Alternative" was not "meaningfully analyzed," and that the

Viaduct Alternative was designed with "unnecessary features." Dkt. No. 28-1 at 23-24.  But

"NEPA does not require the FHWA to pursue alternatives that present unique problems, or are

impractical or infeasible." *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of FHWA*, 756 F.3d 447,

470 (6th Cir. 2014).

According to the record, two viaduct alternatives were eliminated after the scoping process

(V-1 and V-5).  *See* AR at 164.  Alternative V-5, for example, would eliminate east-west travel on

East Genessee Street, a New York State Route and "important east-west street between

Downtown and University Hill," where it crosses Almond Street.  *See id.*  The FHWA reasonably

concluded that eliminating east-west access at East Genesee Street would be inconsistent with the

Project objective to "maintain or enhance vehicular, pedestrian, and bicycle connections in the

local street network ... to allow for connectivity between neighborhoods, business districts, and other key destinations." *Id.* Likewise, the depressed highway alternatives were considered and not recommended for further study. *See id.* at 165. The FHWA noted that, given the high water table and compressible soil in the Project area, those options posed construction concerns. *See id.* In addition, they would result in the removal of local street connections between neighborhoods, as it would not be reasonable to reconnect the streets at every east-west street. *See id.* Again, the FHWA reasonably concluded that this would be contrary to the Project's purpose and need. *See id.* Plaintiffs further allege that the rejection of some of these alternatives makes it "appear" that the FHWA preferred the Community Grid Alternative from the outset. *See* Dkt. No. 28-1 at 22-24. While the record before the Court does not indicate that the FHWA had a preferred alternative from the outset, "evidence that an agency preferred a particular alternative from the outset of the NEPA process does not, by itself, violate NEPA." *Conservation L. Found. v. FHWA*, 630 F. Supp. 2d 183, 202 (D.N.H. 2007) (citing cases).

Even though "[i]t is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion[,]" *Friends of Animals v. Romero*, 948 F.3d 579, 591 (2d Cir. 2020) (quoting *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 558 (2d Cir. 2009)), in response to public comments the FHWA elected to consider whether a long-span bridge was a "reasonable concept ... warranting further evaluation." AR at 31906. The FHWA noted that, due to their high costs, these types of bridges "are rarely, if ever, constructed solely to provide a signature structure when more economical and less impactful options are available." *Id.* The FHWA nevertheless considered interstate and non-interstate options, as well as cable stayed and other bridge types, and analyzed a "Signature Bridge Concept" in more depth. *See id.* at 31907-16. The FHWA found that such a bridge would result in, among other things, (1) a project

26

cost increase of at least $800 million, (2) higher maintenance costs, (3) susceptibility to snow and

ice, and (4) numerous construction difficulties.  *See id.* at 31914-15.  Additionally, the record

indicates that while a bridge would accommodate through traffic (only about twelve percent of

existing viaduct traffic), it would eliminate an important interchange and primary point of access

to the city.  *See id.* at 31915.  Further, a bridge would cause negative impacts to environmental

justice (low income) communities, and it would be a "wider, taller, and more substantial barrier

between neighborhoods" that would put certain areas in "full shadow during winter months." *Id.* at

31916.  As such, the FHWA reasonably concluded that such a bridge would not satisfy the

Project's objectives.

Ultimately, after evaluation, screening, and the submission of public input, the FHWA

advanced the (final) Viaduct Alternative, the (final) Community Grid Alternative, and the No

Build Alternative for further study.  *Id.*  In their motion, Plaintiffs allege that the Viaduct

Alternative contained "unnecessary features" but fail to specify what any of the alleged

unnecessary features were.  The record, however, makes clear that the Viaduct Alternative was

designed to "correct most non-standard and non-conforming highway features" in the Project area.

*See id.* at 178.  Although the Viaduct Alternative may have contained some "unnecessary

features," an agency is "not obligated to consider in detail each and every conceivable variation of

the alternatives stated." *Friends of Animals*, 948 F.3d at 591 (quoting *Monroe Cnty. Conservation*

*Council, Inc. v. Adams*, 566 F.2d 419, 425 (2d Cir. 1977)).

Because the FHWA satisfied NEPA's procedural requirements, Plaintiffs are unlikely to

succeed on the merits of their claim that FHWA unreasonably failed to consider alternatives or

failed to consider such alternatives in greater detail.  *See Sierra Club v. FERC*, 867 F.3d 1357,

1368 (D.C. Cir. 2017) (holding that an agency's "analysis must be 'reasonable and adequately

explained,' but the agency's 'choice among reasonable analytical methodologies is entitled to deference.' ...  As always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues") (citing *Latin Ams. for Social & Econ. Dev. v. Fed. Highway Admin.*, 756 F.3d 447, 475-77 (6th Cir. 2014)).  Having failed to establish a likelihood of success on the merits of any of their claims, Plaintiffs' motion for injunctive relief is denied on this alternative ground.

### 3. Balance of Hardships

Finally, the Court finds that Plaintiffs' motion for injunctive relief must be denied because the balance of hardships and public interest weigh against granting injunctive relief.  While Plaintiffs may have an interest in additional NEPA analysis, that interest is far outweighed by the significant human and financial cost that would result from an injunction.

As the FHWA notes, Plaintiffs must prove that a preliminary injunction would serve the public interest.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Plaintiffs, however, offer nothing more than a conclusory statement that "the grant of preliminary injunctive relief in this case is clearly in the public's interest." Dkt. No. 28-1 at 12.  Yet granting a preliminary injunction would halt a project that addresses structural deficiencies and non-standard highway features that present safety issues for the 95,000 vehicles that travel through the I-81 corridor daily.  *See* AR at 139.  Such safety issues include the following: (1) sections of I-81 that experience crash rates two-to-three times higher than the statewide averages for similar roads; (2) over 190 non-standard and non-conforming features along the corridor; and (3) twenty bridges that were not built to current standards and three bridges that are classified as "structurally deficient." *Id.* at 309, 393-95.  As the record makes clear, these are just a fraction of the safety issues the aging infrastructure of the existing I-81 corridor presents.  An injunction would only

further delay the FHWA's efforts to address these safety issues and any further delay in addressing the many safety issues the existing I-81 corridor presents would put the public at an unnecessary risk. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (holding that when deciding whether to issue an injunction, courts must remain mindful of the public consequences).

Accordingly, Plaintiffs' motion is denied on this alternative ground.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein, the Court hereby

**ORDERS** that Plaintiffs' motion for preliminary injunctive relief (Dkt. No. 28) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 19, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge